```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
IRANDOKHT BAHRAMI,                         :
                                           :
                        Plaintiff,         :    05 Civ. 3829 (RMB)
                                           :
            -against-                      :    FINDINGS OF FACT AND
                                           :    CONCLUSIONS OF LAW
MOHAMMAD ALI SAADAT KETABCHI,              :
a.k.a. MOHAMMAD SAADAT KETABCHI,           :
a.k.a. MOHAMMAD KETABCHI,                  :
a.k.a. HOMAYOUN SAADAT KETABCHI,           :
a.k.a. HAMAYOUN KETABCHI,                  :
                                           :
                        Defendant.         :
------------------------------------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/27/09

### I. Introduction

On or about July 19, 2005, Irandokht Bahrami ("Bahrami" or "Plaintiff") filed an Amended Verified Complaint ("Amended Complaint") against Mohammad Ali Saadat Ketabchi, a.k.a. Mohammad Saadat Ketabchi, a.k.a. Mohammad Ketabchi, a.k.a. Homayoun Saadat Ketabchi, a.k.a. Hamayoun Ketabchi ("Ketabchi" or "Defendant") alleging, among other things, that "on or about January 28, 2005, at approximately 5:00 p.m., Defendant Ketabchi . . . hit Plaintiff, knocked her on the floor and raped her." (Am. Compl., dated July 19, 2005, ¶ 13.) Plaintiff seeks "special damages and punitive damages in an amount of Eight Million and One Hundred Thousand ($8,100,000.00) Dollars together with interest, costs, disbursements and reasonable attorney's fees." (Am. Compl. at p. 6.)

On or about August 12, 2005, Defendant filed an answer and alleged several counterclaims against Plaintiff, arguing, among other things, that the allegations in the Amended Complaint "are completely false and part of a disturbing pattern of behavior by which Plaintiff is harassing Ketabchi in an effort to extort money from him." (Answer to Am. Compl. and

Countercls., dated Aug. 12, 2005 ("Answer"), at ¶ 1.) Defendant charged Plaintiff with malicious prosecution, abuse of process, slander, libel, intentional infliction of emotional distress, prima facie tort, and extortion/attempted larceny.[1] (Answer ¶¶ 9–40.) On or about August 29, 2005, Plaintiff filed an Answer to Defendant's Counterclaims ("Answer to Counterclaims").

In preparation for (bench) trial of this case by the Court, the parties submitted a Joint Pre-Trial Order (see Jt. Pre-Trial Order, dated June 27, 2008 ("PTO")), which contained, among other things, a "statement of undisputed facts" ("Stip. Facts"), and a listing of disputed issues. (See PTO at 4–6.) The parties also submitted trial exhibits. On or about September 10, 2008, the Plaintiff submitted affidavits in lieu of direct testimony of Plaintiff's proposed witnesses, i.e., the Plaintiff and Plaintiff's two daughters, Atosa and Irman Shoughi; and the Defendant submitted affidavits in lieu of direct testimony of Defendant's proposed witnesses, i.e., the Defendant, Defendant's brother, Fred Ketabchi, and Defendant's expert Robert H. Berger, M.D.[2] On or about October 5, 2008, Plaintiff submitted an affidavit in lieu of direct testimony of Plaintiff's expert Craig L. Katz, M.D.

---

[1]   On or about October 26, 2006, Defendant informed the Court that "he will only pursue his causes of action for Defamation for Slander, and Libel." (Ltr. from David M. Goldstein, Esq. to the Honorable Richard M. Berman, dated Oct. 26, 2006.)

[2]   At the close of Defendant's case, the Court granted Defendant's application to "withdraw the affidavit of Fred Ketabchi, from [the Court's] consideration . . . and withdraw calling him as a witness." (Tr. 169:8–12, 14.) The Court also regards Defendant's counterclaims as abandoned as Defendant has not provided testimony or any proposed findings of fact or conclusions of law in support thereof. (See Def. Findings; Def. Reply; Tr. 169:12–13 ("Mr. Dweck [Defense Counsel]: [Defendant] withraw[s] calling [Fred Ketabchi] as a witness. And defense rests.").) See also Desiderio v. Celebrity Cruise Lines, Inc., No. 97 Civ. 5185, 1999 U.S. Dist. LEXIS 9699, at *9–10 (S.D.N.Y. June 28, 1999) ("plaintiffs' post-trial submission propose no findings of fact or conclusions of law on the decision to leave New York, and thus that negligence claim is deemed abandoned."); Anti-Monopoly, Inc. v. Hasbro, Inc., 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) ("the failure to provide argument on a point at issue constitutes abandonment of the issue"). (See infra at p. 18.)

A bench trial was held on October 14, 2008. (See Tr. of Proceedings, dated Oct. 14, 2008 ("Tr.").) At trial, the Court had an excellent opportunity to observe witness demeanor and assess witness credibility.

On or about December 1, 2008, the parties submitted post-trial proposed findings of fact and conclusions of law. (See Pl.'s Proposed Findings of Fact, dated Dec. 1, 2008 ("Pl. Findings"); Def.'s Proposed Findings of Fact and Conclusions of Law, dated Dec. 1, 2008 ("Def. Findings").) The parties also submitted responses to the opposing side's proposed findings of fact and conclusions of law on or about December 12, 2008. (See Pl.'s Response to Def.'s Proposed Findings of Fact and Conclusions of Law, dated Dec. 12, 2008 ("Pl. Reply"); Def.'s Reply to Pl.'s Post Trial Submission, dated Dec. 12, 2008 ("Def. Reply").)[3]

As more fully explained below, the Court concludes that Plaintiff failed to establish her case by a preponderance of the evidence. The evidence that the alleged rape occurred as charged was evenly balanced with evidence that it did not occur as charged by Plaintiff. "[W]here the burden of proof is a preponderance of the evidence, the party with the burden of proof would lose in the event that the evidence is evenly balanced." Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 731 (2d Cir. 2001); see also United States v. Gigante, 39 F.3d 42, 47 (2d Cir. 1994) ("[t]he preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses").

Pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 52(a), the Court's findings of fact and conclusions of law follow:

---

[3] In these Findings of Fact and Conclusions of Law, the Court reflects evidentiary rulings that are material to its determination of the merits. See Nicholls v. Tufenkian Imp./Exp. Ventures, Inc., 367 F. Supp. 2d 514, 516 n.1 (S.D.N.Y. 2005).

3

## II. Findings of Fact

### Plaintiff's Case

1. Plaintiff is a citizen of New York. (PTO ¶ 1.)

2. Defendant is a resident of New Jersey. (PTO ¶ 3.)

3. The parties have known one another for over sixteen years. (Stip. Facts ¶ 12.) In the course of that time, they had ongoing sexual relations. (Stip. Facts ¶ 13.)

4. Plaintiff testified that she was forcibly raped by the Defendant on January 25, 2005 at approximately 5 p.m. at her apartment located at 400 East 57th Street, New York, New York. (Aff. in Lieu of Direct Testimony of Irandokht Bahrami, dated Sept. 9, 2008 ("Pl. Aff."), at ¶¶ 3–4; Am. Compl. ¶ 13; Tr. 79:14–20; 85:1–4.)

5. Plaintiff testified that on January 25, 2005, "[w]hile at [her] apartment, and before [her] daughters arrived, the [D]efendant approached [Plaintiff] about having sex with [her]. [Plaintiff] told him that [she] did not want [Defendant] to touch [her]." (Pl. Aff. ¶ 7.) Plaintiff alleges that Defendant began hitting her in her head, neck, back, and thighs and then "forced himself on [her] and had intercourse with [her] against [her] will." (Pl. Aff. ¶ 7.) The rape allegedly occurred on the living room floor of Plaintiff's apartment. (Pl. Aff. ¶ 7.)

6. Plaintiff testified that: "After [Defendant] raped me on January 25, 2005, I cleaned myself up before my daughters arrived at my house." (Pl. Aff. ¶ 29; see also Dep. Tr. of Irandokht Bahrami, dated Nov. 4, 2005 ("Bahrami Dep."), at 85:23–86:3.)

7. Plaintiff's daughter, Atosa Shoughi, testified that, on "January 25, 2005 . . . one day before Mr. Ketabchi depart[ed] from New York City to Dubai" at "about 7:00, 7:30," "I came to my mother's apartment . . . in order to have dinner with my mother, the

4

[D]efendant, and my sister Irman" and "I saw when I arrived that my mother looked disheveled and disoriented. Her hair was a mess and she had redness and bruises all around her neck." (Aff. in Lieu of Direct Testimony of Atosa Shoughi, dated Sept. 9, 2008 ("A. Shoughi Aff."), at ¶¶ 5, 7; Tr. 41:9–11; 43:13–18.)

8. Atosa Shoughi "admits that she did not witness the alleged rape." (Def. Findings ¶ 51; Tr. 48:12–16.)

9. Plaintiff's daughter, Irman Shoughi, testified that, "on the evening of January 25, 2005 . . . my mother called me on my cell phone [and] told me that I needed to come home for dinner as the [D]efendant wanted to have dinner together that evening because he was leaving for Dubai the following day." (Aff. in Lieu of Direct Testimony of Irman Shoughi, dated Sept. 9, 2008 ("I. Shoughi Aff."), at ¶ 5.) "I arrived at my mother's apartment . . . [and] I immediately noticed that my mother looked disheveled and disoriented. Her hair was a mess and she had redness and bruises all around her neck." (I. Shoughi Aff. ¶¶ 6, 7.)

10. Irman Shoughi "confirmed that she did not see her mother get raped." (Def. Findings ¶ 61; Tr. 74:18–75:3.)

11. "According to Plaintiff and her daughter[s], in the evening [of January 25, 2005], after the alleged rape, the Plaintiff, her two daughters and the Defendant all had dinner together." (Def. Findings ¶ 48; Pl. Aff. ¶ 5.)

12. Plaintiff and her two daughters testified that Defendant departed New York on a trip to Dubai, United Arab Emirates the day following the alleged rape. (See Pl. Aff. ¶ 5 (Plaintiff: "The Defendant was leaving on a trip to Dubai the following day."); A. Shoughi Aff. ¶ 6 (Atosa Shoughi: "Mr. Ketabchi was leaving on a trip to Dubai the

5

following day."); I. Shoughi Aff. ¶ 5 (Irman Shoughi: "[Defendant] was leaving for Dubai the following day.").)

13. Atosa Shoughi testified as follows: "Q: Did you take your mother to the police station and ask them to arrest Mr. Ketabchi? A: Yes. . . . The Court: When did you do it[?] A: I did it in February of 2005. . . . The Court: You went to what police station? A: Seventeen precinct. The Court: And you filed a complaint? A: No, I didn't." (Tr. 51:17–19; 51:24–52:8).

14. Plaintiff has not submitted any police report, criminal complaint, or other documentation to support Atosa Shoughi's testimony that Plaintiff complained to the New York Police Department ("NYPD") at the 17th Precinct ("17th Precinct") in February 2005 that Defendant assaulted Plaintiff on January 25, 2005. (See Pl. Ex. 18; see also Findings of Fact ¶ 17 below.)

15. Atosa Shoughi testified that she and her mother went to the 17th Precinct in April 2005 to file a criminal complaint against Defendant. (See Tr. 53:19–25 ("The Court: And then you went back to the precinct in April? A: Yes. The Court: Of 2005? A: Yes. The Court: And what happened in April? A: She filed a - - for a rape.").)

16. On or about April 12, 2005, Plaintiff filed a criminal complaint ("Criminal Complaint") at the 17th Precinct against the Defendant. (Pl. Ex. 18.) The Criminal Complaint alleges, among other things, that the "above listed Perp former boyfriend [i.e., Ketabchi, Mohammad S] has on several occasions threatened to kill [Plaintiff] thr[ough] phone calls or have his people have [Plaintiff] killed. . . . [Plaintiff] further states [Defendant] has been physically violent to [Plaintiff] several times in the past and was too afraid to report [Defendant]." (Pl. Ex. 18.) The Criminal Complaint charges "Aggravated

Harassment," and states the date of occurrence was "2005-02-16 16:30 Wednesday." (See Pl. Ex. 18.) The Criminal Complaint does not state that Defendant assaulted Plaintiff on or about January 25, 2005. (See Pl. Ex. 18.)

17. Plaintiff's Exhibit 18 includes: (i) a NYPD Incident Information Slip, dated April 12, 2005, listing an alleged crime of "Aggr. Harassment," "Date of Occurrence: 2/16/05," and the "Location of Occurrence: 400 E. 57 St. #10B"; (ii) the NYPD Criminal Complaint, dated April 12, 2005, listing "Ketabchi, Mohammad S" as "wanted" for the alleged crime of "Aggravated Harassment" for an "Occurrence From: 2005-02-16 16:30 Wednesday"; and (iii) a NYPD Incident Information Slip, dated February 28, 2007, listing the alleged crime of "Aggr. Harass.," "Date of Occurrence: 2/28/07," and (the Plaintiff's address as) the "Location of Occurrence: 400 E. 57 St. #10B." (See Pl. Ex. 18.)

18. The Incident Information Slip, dated February 28, 2007, does not include any other information about the alleged complaint apart from listing the alleged crime as "Aggr. Harass.," "Date of Occurrence: 2/28/07," and "Location of Occurrence: 400 E. 57 St. #10B." It does not mention Defendant's name and does not contain an allegation that Defendant assaulted Plaintiff on or about January 25, 2005. (See Pl. Ex. 18.) The Incident Information Slip leaves blank the spaces for "Complaint Report No."; "Accident Report No."; and "Aided Report No." (Pl. Ex. 18.)

19. Craig L. Katz, M.D., a physician duly licensed to practice medicine within the State of New York and a "Diplomate in Adult Psychiatry, American Board of Psychiatry, and Neurology Diplomate in Forensic Psychiatry, American Board of Psychiatry and

7

Neurology," (Aff. in Lieu of Direct Testimony of Craig L. Katz, M.D., dated Oct. 1, 2008 ("Katz Aff."), at ¶ 1), testified as an expert for Plaintiff.

20. On or about December 17 and 18, 2007, Dr. Katz "performed an evaluation of [Plaintiff] regarding her complaint against [Defendant]." (Katz Aff. ¶¶ 2, 3.) As part of his evaluation, Dr. Katz reviewed materials related to the litigation, (see Katz Aff. ¶ 3), but Dr. Katz did not review Plaintiff's medical records, (see Tr. 18:12–17).

21. Dr. Katz diagnosed Plaintiff as having "Posttraumatic Stress Disorder ('PTSD')" and "Major Depression." (Pl. Findings at p. 5; Katz Aff. ¶ 14.)

22. Dr. Katz stated in his affidavit, dated October 1, 2008, that Plaintiff's PTSD was "spurred on by an especially brutal rape in 2005." (Katz Aff. ¶ 28.) At trial, Dr. Katz, in response to the Court's questions, testified as follows:

> The Court:   But you don't know, of your own knowledge, whether she was or was not raped on that day?
>
> Dr. Katz:   No, I do not.
>
> The Court:   So when you say in page 10 of your submission, your affidavit, that you used the phrase, quote, spurred on by an especially brutal rape in 2005, then you go on, you don't have any knowledge of that?
>
> Dr. Katz:   No, [] I don't.

(Tr. 4:8–13).

23. After Dr. Katz testified that he did not have any personal knowledge whether Plaintiff was raped by the Defendant on January 25, 2005, he gave the following testimony: "The Court: how did you come up with the phrase, 'spurred on by an especially brutal rape in January 2005' if you had no knowledge, directly, that such an incident occurred?
A: Well, as a psychiatrist, I can never know that something has happened." (Tr. 8:5–10.)

8

24. Regarding his diagnosis of PTSD, in response to the Court's questions, Dr. Katz testified as follows:

> Dr. Katz:   What I - - what I can say, is that she appeared to have posttraumatic stress disorder related to the events that she described to me with regard to Mr. Ketabchi. It is possible, consistent with how PTSD develops, that past experience may make someone more vulnerable to developing PTSD in response to a recent current trauma.
>
> The Court:   Could your conclusion be the same . . . that it is based on her relationship with him, as opposed to any particular episode with him[?]
>
> Dr. Katz:   Yes, it - - it - - if I'm understanding your question, it could certainly relate to the - - the events that occurred in the course of their relationship, in addition to a particular event.
>
> The Court:   [] or even apart from[?]
>
> Dr. Katz:   It's a possibility.

(Tr. 10:2–17.)

25. Plaintiff and her daughters made varying statements with regard to the date of the alleged rape. In the Amended Complaint, Plaintiff alleged that the rape occurred on January 28, 2005. (Am. Compl. ¶ 13.) Plaintiff testified, during her deposition on November 4, 2005, that the alleged rape took place on January 27, 2005. (See Bahrami Dep. 6:7–14, 7:3–5, 13:22–23, 15:5–8, 89:21–25, 91:16–18; see also Tr. 82:2–13.) In an affidavit, dated December 29, 2005, Atosa Shoughi stated, among other things, that the alleged rape occurred on January 27, 2005. (See Def. Ex. 26 ¶ 4; see also Tr. 43:5–12.) In an affidavit, dated December 29, 2005, Irman Shoughi, stated, among other things, that the alleged rape occurred on January 27, 2005. (See Def. Ex. 27 ¶ 4; see also Tr. 69:5–12.)

26. At trial, Plaintiff, Atosa, and Irman Shoughi testified as follows: Plaintiff: "I was forcibly raped by the [D]efendant on January 25, 2005." (Pl. Aff. ¶ 3); Atosa Shoughi:

9

"In January of 2005 (prior to the January 25th rape) Mr. Ketabchi was in my mother's apartment together with my mother and me." (A. Shoughi Aff. ¶ 13); Irman Shoughi: "on the evening of January 25, 2005, [] my mother called me on my cell phone [and] told me that I needed to come home for dinner" and "[a]fter dinner my mother told me that Mr. Ketabchi raped her." (I. Shoughi Aff. ¶¶ 5, 14). They also testified as follows: Plaintiff: "I only agree to the fact that it was one day before he went to Dubai . . . and it was between the date of January 25th and 28th. . . . I, myself, have reached the conclusion that the day when he went to Dubai, one day before that, it was the 25th." (Tr. 84:4–25); Atosa Shoughi: "So, regardless, that I put January 27, 2005 [in a prior affidavit] it still is January 25, 2005, because it is one day before Mr. Ketabchi depart[ed] from New York City to Dubai." (Tr. 41:9–11); Irman Shoughi: "So I don't know about the date, sir, so because the date, exactly, we don't have calendar at home, we don't keep track. But I know exactly was one night before he leaves to Dubai. So I'm sure about that." "Q: And when you wrote down here that your mother called you on January 25, 2005, you gave the lawyer the date; is that right? A: I believe one day before he leaves to Dubai. I told you repeatedly." (Tr. 71:2–5, 72:14–17).

27. There are no medical records indicating that Plaintiff suffered physical injuries on or about January 25, 2005. (Def. Findings ¶ 11; see also Def. Exs. 7, 8.) And, the (three) documents Plaintiff filed with the NYPD which were submitted collectively as Plaintiff's Exhibit 18 do not include the allegation that Plaintiff was raped or otherwise assaulted by the Defendant on or about January 25, 2005. (See Pl. Ex. 18; see also Findings of Fact above at ¶¶ 13–16.)

**Defendant's Case**

28.  Defendant testified that "[a]ny accusation by Ms. Bahrami that [he] raped her is absolutely false." (Aff. in Lieu of Direct Testimony of Mohammad Ketabchi, dated July 31, 2008 ("Def. Aff."), at ¶ 9.) Defendant also testified that his "sexual relations with the Plaintiff were always on a consensual basis." (Def. Aff. ¶ 6.)

29.  Defendant acknowledges that he had dinner with the Plaintiff and her two daughters at Plaintiff's apartment a "few days before" he left on his trip to Dubai "from [John F. Kennedy International Airport ('JFK')] on January 26, 2005." (Def. Findings ¶ 39; see also Tr. 117:9–13; Tr. 116:13–20 ("Q: Now, on January 28th of . . . 2005, you were in Dubai that day, correct? A: Yes. Q: And on January 27 of 2005, you were also in Dubai? A: No. Actually I was in - - in Frankf[urt]. Then we left from Frankf[urt] on the way to Dubai. Q: So you had left New York? A: I'm not sure, late night or sometimes.").)

30.  Defendant denies that he was present at the Plaintiff's apartment on January 25, 2005. (See Tr. 116:24–117:1 ("Q: And on January 25, 2005, you were with the plaintiff, Ms. Bahrami? A: Never. No.").)

31.  Defendant acknowledges that he spoke with the Plaintiff on the telephone on January 25, 2005. (Tr. 117:2–3 ("Q: Did you talk to her [on January 25, 2005]? A: On the phone, yes."); Tr. 131:20–22 ("Q: Mr. Ketabchi, your testimony a few moments ago was that you did not see Ms. Bahrami on January 25, 2005? A: Not at all.").)

32.  Defendant's Exhibit 13 consists of telephone records showing the time, date, and telephone numbers called from either Plaintiff's home telephone number, or her cellular telephone number. (See Def. Ex. 13.) These records show that telephone calls were

11

made from Plaintiff's cellular telephone to Defendant's home telephone in Ramsey, New Jersey on January 25, 2005. (See Def. Findings ¶¶ 13–31.) For instance, the "Plaintiff's telephone records confirm that a call was made on January 25, 2005 from the cell phone of the Plaintiff . . . at 5:25 p.m. to Defendant's home in Ramsey, New Jersey . . . which lasted for 14 minutes." (Def. Findings ¶ 24; Tr. 82:15–21.) And, the "Plaintiff's phone records reflect a call on January 25, 2005, from her cell phone . . . to the home of the Defendant in Ramsey, New Jersey at 8:36 p.m." (Def. Findings ¶ 29; Tr. 85:6–9.) These records also show that Defendant exchanged four additional phone calls with Plaintiff on January 25, 2005. (See Def. Findings ¶¶ 18, 25.) For example, "[o]n January 25, 2005, the Defendant made a telephone call from his cell phone to the Plaintiff at 1:19 p.m. and spoke with her for four minutes at her home . . . and thereafter the Defendant received a telephone call from the Plaintiff from her home phone number . . . and spoke to him on his cell phone number . . . at 3:27 p.m." (Def. Findings ¶ 18.) And, "[o]n January 25, 2005, the Defendant called the Plaintiff from his cell phone . . . at 6:49 p.m. for one minute on the cellular phone, and then at 6:50 P.M. for three minutes on her land line." (Def. Findings ¶ 25.)

33. At trial, Defendant was shown the above telephone records included in Defendant's Exhibit 13 and testified as follows: "Q: And is this the document that refreshes you that on January 25th you never saw Ms. Bahrami? A: Never. Never." (Tr. 134:24–135:1; see also Tr. 131:23–132:1 ("Q: How do you know that [you were not at Plaintiff's apartment on January 25, 2005], sir? A: Because I have - - from - - from 8:41, morning, up to, night, 8:40 more, I believe 35 phone calls in-coming/out[go]ing with my people and Ms. Bahrami.").)

34. Copies of Defendant's airplane ticket from John F. Kennedy International Airport in New York to Dubai, and his stamped passport confirm that Defendant left New York on January 26, 2005 and arrived in Dubai on January 28, 2005. (Def. Exs. 1, 10.) "On January 28, 2005, the Defendant was in Dubai." (Def. Findings ¶ 40; Tr. 116:13–18; Def.'s Exs. 1, 10). "On January 27, 2005, the Defendant was in Frankfurt, Germany, en route to Dubai having departed from JFK on January 26, 2005 as reflected by his airplane ticket." (Def. Findings ¶ 39; Tr. 116:17–18; Def. Ex. 10.)

35. Robert H. Berger, M.D., a physician duly licensed to practice within the State of New York and "Board Certified in Psychiatry by the American Board of Psychiatry and Neurology since 1982, by the American Board of Forensic Psychiatry, Inc. since 1991, by the American Board of Psychiatry and Neurology, with added qualifications in Forensic Psychiatry since 1994," (Aff. in Lieu of Direct Testimony of Robert Berger, M.D., dated Aug. 21, 2008 ("Berger Aff."), at ¶¶ 1, 5), was called to testify as an expert on behalf of Defendant.

36. Dr. Berger "examined the Plaintiff [] on January 11, 2006 and January 12, 2006 for a total of eight hours." (Berger Aff. ¶ 11.) Dr. Berger testified that he "performed a thorough psychiatric examination and a psycho social evaluation." (Berger Aff. ¶ 11.) As part of his evaluation, Dr. Berger reviewed documents related to the litigation including, the Complaint, dated April 14, 2005, the Amended Verified Complaint, dated July 19, 2005, Defendant's Responses to Plaintiff's Interrogatories, Plaintiff's Responses to Defendant's Interrogatories, the St. Vincent Catholic Medical Center in Crisis Program Report, dated August 23, 2005, and the Millon Clinical Multiaxial Inventory Third Revision ("MCMI-III"), as well as Plaintiff's medical records, including, but not limited

13

to, the medical records maintained by Dr. Thomas Caputo, Dr. Jeffrey Siegel, Dr. Faoud Surur, Dr. Martin Annis, and Dr. Joanne Pace. (See Berger Aff. ¶ 14.) Dr. Berger stated that these medical records demonstrated Plaintiff's "persistent pursuit of medical attention and medical care, despite being told by physicians that, in many different areas, there was nothing wrong. Then, of course, there were important medical findings which, again could, in part, account for her depression and her anxiety." (Tr. 157:22–158:3.)

37. Dr. Berger's diagnosis of Plaintiff is "Dysthymic disorder, chronically depressed mood (not causally related to the alleged complaint incidents); general anxiety disorder (chronic feelings of anxiety not causally related to the alleged complaint incidents); somatization disorder (pattern of recurring multiple physical-somatic complaints, which are not fully explained by any known medical condition – not causally related to the alleged complaint incidents)"; and "borderline personality disorder with prominent narcissistic and histrionic features (these are chronic conditions and are not causally related to the alleged complaint incidents)." (Berger Aff. ¶¶ 15, 16.)

38. Dr. Berger testified that "from my clinical examination of Ms. Bahrami, and review of the medical records, and my more than 30 years of experience in psychiatry and behavioral science, and my teaching and research as a full clinical professor at [New York University], it was my opinion that [Plaintiff] suffered from a depressive condition. It's my opinion that the depressive condition likely fell within the dysthymic category. I could not substantiate more. And I didn't think that it would be fair to minimize the depression to diagnose anything less than that." (Tr. 153:15–24.)

39. Dr. Berger testified: "I don't know whether what [Plaintiff] claims against Mr. Ketabchi is true or not true. I was not there. And I'm not privy to other kinds of information a

factfinder might be privy to." (Tr. 162:17–20.) And, "I cannot state a medical opinion that she was or was not raped. Or that her complaint of having been raped is or is not valid. . . . I couldn't find her descriptions of these events to be sufficiently credible to me because, in the context of everything else, I don't find her to be a credible individual, particularly around issues that are emotionally laden." (Tr. 165:14–22.)

40. Dr. Berger also testified that, "as far as [Plaintiff] trying to feign any particular psychiatric condition, I did not see that. I thought that she cried because she became emotionally overwhelmed. She seemed anxious. She seemed very angry. And I thought that those were real feelings. I didn't know, necessarily, what the genesis or etiology of those were." (Tr. 155:2–155:7.)

41. Dr. Berger testified that "I wanted to credit her, to be able to say, this woman isn't healthy right now. There is - - you know, just from my experience and from my own professional empathy, I could tell that there is distress. And I was not going to write a diagnosis, whether I was retained by the Defendant or not, that there is no mental disorder, no mental condition merely because she didn't provide me with [certain] information. I saw there was distress. I saw the distress in certain basic areas; depression, I saw anxiety, anger." (Tr. 157:11–20.)

**Summary**

42. The evidence presents a stalemate between Plaintiff and Defendant. There is no preponderance of credible evidence that Defendant assaulted Plaintiff at Plaintiff's apartment on January 25, 2005.[4]

---

[4] Nor is there a preponderance of evidence that Plaintiff committed slander or libel against the Defendant as alleged in Defendant's counterclaims.

### III. Conclusions of Law

1. Under New York law, "a rape is an undisputed assault and battery." <u>Girden v. Sandals Int'l</u>, 262 F.3d 195, 203 (2d Cir. 2001) (quoting <u>United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.</u>, 994 F.2d 105, 108 (2d Cir. 1993)).[5] <u>See also</u> <u>Nicholson v. Luce</u>, 866 N.Y.S.2d 52, 53 (N.Y. App. Div. 1st Dep't 2008) ("A claim for sexual assault may be framed as a claim for either assault or battery.").

2. Under New York law, "[b]attery lies against a person who '[i] intentionally touches another person, [ii] without that person's consent, and [iii] causes an offensive bodily contact.'" <u>Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.</u>, 425 F.3d 126, 134 (2d Cir. 2005) (quoting <u>Jeffreys v. Griffin</u>, 769 N.Y.S.2d 184, 189 n.2 (N.Y. 2003)). <u>See also</u> <u>Cerilli v. Kezis</u>, 790 N.Y.S.2d 714, 715 (N.Y. App. Div. 2d Dep't 2005); <u>Charkhy v. Altman</u>, 678 N.Y.S.2d 40, 41 (N.Y. App. Div. 1st Dep't 1998).

3. Under New York law, "an 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact." <u>Girden</u>, 262 F.3d at 203 (quoting <u>United Nat'l Ins. Co.</u>, 994 F.2d at 108). <u>See also</u> <u>Charkhy</u>, 678 N.Y.S.2d at 41.

4. "[I]n a bench trial such as this, [] it is [the Court's] job to weigh the evidence[,] assess credibility, [and] rule on the facts as they are presented." <u>Johnson-McClean Techs. v. Millennium Info. Tech. Group</u>, No. 02 Civ. 244, 2003 U.S. Dist. LEXIS 1092, at *24 (S.D.N.Y. Jan. 27, 2003); <u>see also</u> <u>Mathie v. Fries</u>, 121 F.3d 808, 811–12 (2d Cir. 1997). The Court was "in the best position to evaluate [each] witness's demeanor and tone of voice as well as other mannerisms that bear heavily on one's belief in what the witness

---

[5] "The parties' briefs assume that New York law controls and such implied consent . . . is sufficient to establish choice of law." <u>Krumme v. Westpoint Stevens, Inc.</u>, 238 F.3d 133, 139 (2d Cir. 2000) (internal quotations omitted).

says." Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 634 (2d Cir. 1996); see also Anderson v. Bessemer City, 470 U.S. 564, 575 (1985) ("only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.").

5. Where, as here, the evidence is equally divided as to whether Plaintiff was raped by the Defendant on or about January 25, 2005, (see ¶ 42), "the party with the burden of proof loses." United States v. Gigante, 39 F.3d 42, 47 (2d Cir. 1994); see also Fulop v. Malev Hungarian Airlines, 244 F. Supp. 2d 217, 223 (S.D.N.Y. 2003) ("The evidence on this issue is substantially divided and, in the Court's assessment, does not tilt sufficiently to Plaintiff's case to satisfy the preponderance standard."); see also Gray v. Macy's East, Inc., 807 N.Y.S.2d 374, 375 (N.Y. App. Div. 1st Dep't 2006); Higgins v. Hamilton, 794 N.Y.S.2d 421, 422 (N.Y. App. Div. 2d Dep't 2005); (see also Findings of Fact ¶ 42).

6. A "victim's testimony about [] assaults and rapes" can be supported by, among other things, "[a] doctor who examined her," a "police officers' testimony as to her demeanor and physical appearance," "the actions of the victim herself," and the defendant's "own conduct." Smith v. Edwards, No. 98 Civ. 7962, 2000 U.S. Dist. LEXIS 7414, at *22 (S.D.N.Y. May 31, 200). "[C]orroboration is not required to establish rape or other sex offenses," People v. Alford, 287 A.D.2d 884, 886 (N.Y. App. Div. 3d Dep't 2001), and "[a]ny lack of corroboration goes merely to the weight of the evidence, not to its sufficiency," Duran-Peralta v. United States, No. 90 Civ. 3839, 1990 U.S. Dist. LEXIS 9360, at *15 (S.D.N.Y. July 27, 1990). See also Iota Industries, Inc. v. Friedlander, 430 F. Supp. 198, 201 (S.D.N.Y. 1977) ("[F]acts and circumstances support and corroborate the credibility of [] testimony.").

7. Expert testimony may "be received . . . not as evidence that a forcible rape occurred but rather to aid the [fact-finder] in its consideration of [the victim's] behavior in the aftermath of the alleged rape." People v. Story, 176 A.D.2d 1080, 1081 (N.Y. App. Div. 3d Dep't 1991). Neither expert in this case knew whether or not a rape occurred and "the expert testimony was evenly balanced." Ragin v. Harry Macklowe Real Estate Co., 801 F. Supp. 1213, 1226 (S.D.N.Y. 1992).

8. Defendant's counterclaims are abandoned because he failed to provide testimony or propose findings of fact or conclusions of law in support of his counterclaims. Desiderio v. Celebrity Cruise Lines, Inc., No. 97 Civ. 5185, 1999 U.S. Dist. LEXIS 9699, at *9–10 (S.D.N.Y. June 28, 1999) ("plaintiffs' post-trial submissions propose no findings of fact or conclusions of law on the decision to leave New York, and thus that negligence claim is deemed abandoned."); Anti-Monopoly, Inc. v. Hasbro, Inc., 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) ("the failure to provide argument on a point at issue constitutes abandonment of the issue"); Ortho Pharm. Corp. v. Cosprophar, Inc., 828 F. Supp. 1114, 1129 (S.D.N.Y. 1993) (dismissing claim where party "appears to have abandoned this claim, having failed to argue the claim in its post-trial memo"); see also Supra at 2 n.2.

IV. **Conclusion and Order**

For the foregoing reasons, the Clerk of Court is respectfully requested to enter judgment in favor of the Defendant. Thereafter, the Clerk is respectfully requested to close this case.

Dated: New York, New York
February 27, 2009

*RMB*
_____
**RICHARD M. BERMAN, U.S.D.J.**